IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FRANCIS N. LEE,<br><br>               Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA<br><br>               Defendant. | Case No. 23-1143C<br>Senior Judge Marian Blank Horn |

## SECOND AMENDED COMPLAINT

Plaintiff, Lieutenant Colonel Francis N. Lee ("Plaintiff" or "LTC Lee"), brings this action against Defendant, the United States of America ("Defendant"), and alleges the following:

### INTRODUCTION

1. This is an action for denial of pay due Plaintiff under 5 U.S.C. § 5538 (the "Reservist Differential Pay statute"), under which members of the reserve components who are also federal Government employees are entitled to the difference between their civilian and military pay when mobilized to active duty.

### JURISDICTION

2. This Court has jurisdiction over this action pursuant to the Tucker Act, 28 U.S.C. §1491(a)(1).

3. The statutory basis for invoking jurisdiction is the Reservist Differential Pay statute, 5 U.S.C. § 5538. The Reservist Differential Pay statute provides that employing agencies must pay differential payments to eligible federal civilian employees when they have experienced a pay differential due to active military service in certain circumstances.

4. The Reservist Differential Pay statute is money-mandating. *Downey v. United States*, 147 Fed. Cl. 171 (2020).

1

5. This complaint alleges money damages in excess of $10,000, discussed further below in Paragraphs 9-59.

6. In accordance with 28 U.S.C. § 2501, this action is brought within six years from the date Defendant wrongfully denied Plaintiff his due pay differential.

## PARTIES

7. Plaintiff, Lieutenant Colonel Francis N. Lee, is a citizen of the United States who resides in Boeblingen, Germany.

8. Defendant is the United States of America, acting by and through the Defense Intelligence Agency (DIA), a United States government agency.

## FACTUAL ALLEGATIONS

9. LTC Lee currently is, and was at the time of the occurrences giving rise to this Complaint, a civilian employee of the Defense Intelligence Agency (DIA).

10. During calendar years 2018-2020, LTC Lee held a civilian pay grade of GG-14, Step 6. Beginning in calendar year 2021, LTC Lee's civilian pay grade increased to GG-14, Step 7.

11. LTC Lee also serves in the United States Army Reserve and currently holds the rank of Lieutenant Colonel (O-5). LTC Lee held this rank during the time periods relevant to this Complaint.

12. At the time of the occurrences giving rise to this Complaint, LTC Lee was mobilized to Special Operations Command Europe (SOCEUR) in Stuttgart, Germany, where he was paid as an O-5 with between sixteen and twenty years of service.

13. On or about September 4, 2018, Plaintiff received orders to mobilize to active duty for the purpose of "contingency operation for active duty operational support (CO-ADOS) in support of" Operational Atlantic Resolve – European Reassurance Initiative (OAR-ERI) for

365 days commencing October 1, 2018. These orders cited 10 U.S.C. § 12301(d) as the statutory authority for the mobilization. Exhibit A is a true and correct copy of Plaintiff's September 4, 2018, mobilization orders.

14. Plaintiff's September 4, 2018, mobilization orders were amended eight times, on or about September 26, 2018, September 3, 2019, October 31, 2019, September 4, 2020, June 25, 2021, August 19, 2021, December 21, 2021, and June 27, 2022. The purpose of the September 26, 2018 amendment was to update the name of the operation LTC Lee was mobilized to from OAR-ERI to EDI (European Deterrence Initiative).[1] The purpose of the October 31, 2019 order was to add an additional line of accounting to fund LTC Lee's mobilization. The remaining amendments extended the length of LTC Lee's mobilization, which ultimately ended on or about September 30, 2022. True and correct copies of the amendments to Plaintiff's September 4, 2018 mobilization orders are attached as Exhibit B.

15. From the start of his mobilization (October 1, 2018) through June 2021, LTC Lee served as SOCEUR's Deputy Director for Intelligence. From June 2021 until the end of his mobilization (September 30, 2022), LTC Lee served as SOCEUR's Algorithmic Warfare Division Chief.

16. At no point during his mobilization did LTC Lee receive differential pay under the Reservist Differential Pay statute.

17. In relevant part, 5 U.S.C. § 5538(a), the Reservist Differential Pay statute, provides:

> An employee who is absent from a position of employment with the Federal Government in order to perform active duty in the uniformed services pursuant to a call or order to active duty under . . . a provision of law referred to in section 101(a)(13)(B) of title 10

---

[1] The abbreviations "OAR-ERI" and "EDI" are used interchangeably throughout this Complaint.

3

> shall be entitled, while serving on active duty, to receive, for each pay period described in subsection (b), an amount equal to the amount by which—
>
> > (1) the amount of basic pay which would otherwise have been payable to such employee for such pay period if such employee's civilian employment with the Government had not been interrupted by that service, exceeds (if at all)
> >
> > (2) the amount of pay and allowances which (as determined under subsection (d))—
> >
> > > (A) is payable to such employee for that service; and
> > >
> > > (B) is allocable to such pay period.

18. 10 U.S.C. § 101(a)(13)(B) defines "contingency operation" as

> a military operation that . . . results in the call or order to, or retention on, active duty of members of the uniformed services under section 688, 12301(a), 12302, 12304, 12304a, 12305, or 12406 of this title, chapter 13 of this title, section 3713 of title 14, or any other provision of law during a war or during a national emergency declared by the President or Congress.

19. The statutory authority under which LTC Lee was ordered to active duty, 10 U.S.C. § 12301(d), is a provision of law.

20. On September 14, 2001, President George W. Bush issued Presidential Proclamation 7463, declaring a state of national emergency "by reason of the terrorist attacks at the World Trade Center . . . and the continuing and immediate threat of future attacks on the United States." Proclamation No. 7463, 66 Fed. Reg. 48199 (Sept. 14, 2001). This proclamation has been renewed annually, most recently on September 7, 2023, by President Joseph R. Biden. Continuation of the National Emergency With Respect to Certain Terrorist Attacks, 88 Fed. Reg. 62433 (Sept. 7, 2023). Thus, the United States is, and has at all times since September 11, 2001, including the entire duration of LTC Lee's call to active duty, been under a state of national emergency declared by the President.

21. Despite the ongoing nature of this national emergency and the extensive use of 10 U.S.C. § 12301(d) to order numerous reservists to active duty for various missions, the Federal Circuit has held that not all reservists mobilized under 10 U.S.C. § 12301(d) since September 11, 2001 qualify under the Reservist Differential Pay statute. Instead, "to be entitled to differential pay [a Servicemember] must have served pursuant to a call to active duty that meets the statutory definition of contingency operation." *Adams v. Dep't of Homeland Sec.*, 3 F.4th 1375, 1378 (Fed. Cir. 2021), *cert denied,* 142 S.Ct. 2835 (2022) ; *see also Nordby v. Soc. Sec. Admin.*, 67 F.4th 1170, 1173 (Fed. Cir. 2023) ("[T]o receive differential pay, an employee must have been called to active duty that meets the statutory definition of a 'contingency operation.'").

22. Service in a contingency operation includes "activation under the enumerated provisions listed in 10 U.S.C. § 101(a)(13)(B) or activation by 'any other provision of law during a war or during a national emergency declared by the President or Congress.'" *Nordby*, 67 F.4th at 1173. But, "to satisfy as 'any other provision of law' under 10 U.S.C. § 101(a)(13)(B) and qualify as a contingency operation, there must be a connection between the voluntary military service and the declared national emergency." *Id.*

23. Army Regulation (AR) 135-200 "prescribes policies and procedures for ordering Army National Guard (ARNG), Army National Guard of the United States (ARNGUS), and U.S. Army Reserve (USAR) Soldiers" to various forms of active duty. AR 135-200, *Active Duty for Missions, Projects, and Training for Reserve Component Soldier*s, ¶ 1-1 (Oct. 20, 2020), https://armypubs.army.mil/epubs/DR_pubs/DR_a/ARN30084-AR_135-200-000-WEB-1.pdf (last visited Nov. 15, 2023).

24. Chapter 6 of AR 135-200 pertains to Active Duty for Operational Support (ADOS), which is active-duty service performed "to provide the necessary skilled manpower

assets to support existing or emerging requirements." *Id.* ¶ 6-1(c).  ADOS performed in support of an Active Component (AC) unit or command is known as "ADOS-AC." *Id.* ¶ 6-1(c)(2).  Because SOCEUR is an Active Component command, the active-duty service to which LTC Lee was ordered was ADOS-AC service.

25.     There are three different types of ADOS-AC service.  Of these, LTC Lee's orders establish that he was ordered to ADOS-AC service known as "CO-ADOS" – active duty performed by a reservist in support of an overseas contingency mission.  *Id.* ¶ 6-1(c)(2)(c).

26.     Section IV of Chapter 6 of AR 135-200 governs the issuance of CO-ADOS orders.  In particular, AR 135-200 limits the Army's use of CO-ADOS orders to circumstances "when the Secretary of Defense declares that a situation exists as outlined in paragraph 6-19(a), which requires the services of individual ARNGUS, or USAR members in support of contingency operations without the involuntary call-up of [Reserve Component] forces or military operations under the Presidential Reserve Call-up authority." *Id.* ¶ 6-19(b).

27.     In turn, paragraph 6-19*a* defines a contingency operation as, *inter alia*, an operation that

> results in the call or order to, or retention on, [active duty] of members of the uniformed services under 10 USC 688, 10 USC 12301(a), 10 USC 12302, 10 USC 12304, 10 USC 12305, 10 USC 12406, AR 135-210, or any other provision of law during a war or during a national emergency declared by the President or Congress.

*Id.* ¶ 6-19(a).  This is substantially identical to the definition of "contingency operation" in 10 U.S.C. § 101(a)(13)(B), as invoked in the Reservist Differential Pay statute.

28.     Read together, paragraphs 6-19*a* and 6-19*b* of AR 135-200 prescribe the use of CO-ADOS orders only when the resulting active-duty service meets the definition of a contingency operation.  *See also id.* ¶ 6-20(a) ("Only CO-ADOS may be used to order [Reserve Component] Soldiers to [Active Duty] for a crisis or contingency mission of the [Regular Army],

6

[Office of the Secretary of Defense], Office of the Joint Chiefs of Staff, or Joint Command when the mission requires specialized experience or knowledge which the [Reserve Component] Soldier possesses and which is unavailable in the [Regular Army].").

29.     Except when mobilizing a member of the Retired Reserve, the only statutory authority that the Army is permitted to cite when issuing CO-ADOS orders is 10 U.S.C. § 12301(d).  *Id.* ¶ 6-25(a).

30.     Because 10 U.S.C. § 12301(d) is not enumerated in the AR 135-200 definition of "contingency operation," however, the Army can only issue CO-ADOS orders pursuant to 10 U.S.C. § 12301(d) if it qualifies as "any other provision of law during a war or during a national emergency declared by the President or Congress."  As the Federal Circuit made clear in *Nordby*, for 10 U.S.C. § 12301(d) to qualify as "any other provision of law," the active duty service and the national emergency must be connected.  *Nordby*, 67 F.4th at 1173.

31.     LTC Lee's mobilization orders (Exhibit A) are CO-ADOS orders.  It follows that the active-duty service LTC Lee was being ordered to perform *must* satisfy the definition of "contingency operation."  Moreover, because LTC Lee's mobilization orders cite 10 U.S.C. § 12301(d) as the statutory authority for his mobilization, in accordance with AR 135-200, the active-duty service LTC Lee was being ordered to perform *must* satisfy the definition of "contingency operation" via a connection between the service and the declared national emergency.

32.     LTC Lee's service therefore qualifies for differential pay under 5 U.S.C. § 5538 for the four-year period October 1, 2018 through September 30, 2022.

33.     Beyond the fact that LTC Lee's mobilization orders expressly state that his active-duty service was part of a contingency operation, and that the very issuance of his mobilization

orders necessarily requires the Army to have made the requisite determinations to support the issuance of his CO-ADOS orders, the operation to which LTC Lee mobilized (OAR-ERI) bears indicia of a contingency operation.

34. For example, from fiscal year (FY) 2015 through FY 2021, OAR-ERI and EDI were funded entirely through Overseas Contingency Operations (OCO) appropriations. *See* Gov't Accountability Office, GAO-23-105619, *European Deterrence Initiative: DOD Should Establish Performance Goals and Measures to Improve Oversight* (2023), https://www.gao.gov/assets/gao-23-105619.pdf.

35. Similarly, in its OCO budget request for FY 2019, the Air Force noted that the reauthorization of Presidential Proclamation 7463 provided it with "the authority to order to active duty Ready Reserve Members" and requested additional military personnel appropriations "to finance the incremental costs . . . for personnel mobilized for duty . . . in support of OFS, OIR ***and EDI***" accordingly. Dep't of the Air Force, *Fiscal Year (FY) 2019 Budget Estimates, Overseas Contingency Operations (OCO) Request, Military Personnel Appropriation* 1, 4 (2018), https://www.saffm.hq.af.mil/Portals/84/documents/FY19/MILPERS/Air%20Force%20Military%20Personnel%20OCO%20FY19.pdf?ver=2018-02-12-182920-317 (emphasis added).

36. Moreover, insofar as the continuing threat of terrorism animates the ongoing declaration of national emergency, OAR-ERI encompasses counter-terrorism operations. For instance, OAR-ERI includes "increased partnership activities with NATO and other partner nations [and] build and strengthen regional partner capacity to responsibly manage and conduct counter terrorism and stability operations. This initiative will also enhance the NATO and partner nation counter terrorism training and interoperability with U.S. forces." Dep't of Def.,

*Department of Defense Budget Fiscal Year 2015, Counterterrorism Partnerships Fund and the European Reassurance Initiative* 22 (2014), https://comptroller.defense.gov/Portals/45/Documents/defbudget/fy2015/amendment/FY2015_OCO_CTPF_and_%20ERI.pdf.

37. LTC Lee likewise engaged in counter-terrorism activities while on active duty. In his roles as SOCEUR's Deputy Director of Intelligence and Algorithmic Warfare Chief, LTC Lee guided and synchronized SOCEUR's Intelligence Directorate to support execution of the SOCEUR Campaign Plan; established a Baltic region multi-national intelligence cell; enhanced SOCEUR's understanding of Russian malign activity in the European Area of Responsibility (AOR); and provided intelligence support to warfighters in furtherance of national security objectives in Ukraine.

38. SOCEUR's mission is to "employ[] special operations forces across the USEUCOM [United States European Command] area of responsibility to enable deterrence, strengthen European security collective capabilities and interoperability, and counter transnational threats to protect U.S. personnel and interests." U.S. Special Operations Command, *United States Special Operations Command, Fact Book – 2019* 37, https://www.socom.mil/FactBook/2019%20Fact%20Book.pdf (last visited Nov. 12, 2023). One of SOCEUR's "key focus area[s] is combatting terrorism in USEUCOM's southern flank." *Id.* The counter-terrorism aspects of SOCEUR's mission are accomplished through multiple lines of effort, including soft power diplomacy, capacity building, and support of active counter-terrorism operations. As SOCEUR's Deputy Director for Intelligence and Algorithmic Warfare Division Chief, LTC Lee was involved across these lines of effort.

39. LTC Lee's work establishing a Baltic region multi-national intelligence cell likewise played a direct role in counter-terrorism operations. Following the emergence of ISIS in the 2010s, refugees and other immigrants from Africa and the Middle East began flowing into the Baltic region, presenting numerous counter-terrorism and other security challenges. The Baltic region multi-national intelligence cell facilitates coordination between regional partners and the United States to share vital security information, identify potential threats, and prevent terrorist attacks.

40. LTC Lee also coordinated and participated in mission-planning for active counter-terrorism operations, including as a subject matter expert for intelligence-related matters. Given his expertise in this regard, he was also tasked with identifying ways SOCEUR could enhance its ongoing counter-terrorism efforts.

41. Further, LTC Lee participated as SOCEUR's representative to the broader counter-terrorism mission of the Department of Defense. For example, LTC Lee was twice detailed to work with United States Special Operations Command (USSOCOM) as part of its global special operations counter-terrorism task force, which unites various stakeholders to address emerging threats and coordinate a multi-national response to terrorist activities. LTC Lee was directly responsible for determining the scope of SOCEUR's support to this task force, including the designation of a SOCEUR intelligence analyst to work full-time to support USSOCOM's counter-terrorism operations.

42. LTC Lee also supported the counter-terrorism missions of other combatant commands, including United States Central Command (CENTCOM) and United States Africa Command (AFRICOM). For example, LTC Lee coordinated the provision of intelligence assets to special operations forces, assisted as a mission planner for operations, and provided

intelligence updates to military personnel engaged in active counter-terrorism operations throughout the CENTCOM and AFRICOM AORs.

43. These are additional reasons that LTC Lee's active-duty service qualified him for differential pay under 5 U.S.C. § 5538(a) for the four-year period October 1, 2018 through September 30, 2022.

## COMPUTATION OF DIFFERENTIAL PAY OWED

44. The Reservist Differential Pay statute further provides that

> amounts under this section shall be payable with respect to each pay period (which would otherwise apply if the employee's civilian employment had not been interrupted) during which such employee is entitled to re-employment rights under chapter 43 of title 38 with respect to the position from which such employee is absent (as referred to in subsection (a)); and for which such employee does not otherwise receive basic pay (including by taking any annual, military, or other paid leave) to which such employee is entitled by virtue of such employee's civilian employment with the Government.

5 U.S.C. § 5538(b).

45. LTC Lee's mobilization began on or about October 1, 2018 and continued until on or about September 30, 2022. During this time, LTC Lee was entitled to re-employment rights with respect to his position within the DIA under chapter 43 of Title 38, United States Code.

46. During his mobilization, LTC Lee was paid as an O-5 with between sixteen and twenty years of service, rather than as a GG-14, Step 6 or GG-14, Step 7 civilian employee.

47. The Office of Personnel Management (OPM) publishes Policy Guidance Regarding Reservist Differential under 5 U.S.C. § 5538 at https://www.opm.gov/policy-data-oversight/pay-leave/pay-administration/reservist-differential/policyguidance.pdf (hereinafter the

"OPM Policy Guidance").  The OPM Policy Guidance explains in detail how to compute reservist differential.

48.     First, the OPM Policy Guidance requires "projecting the gross amount of civilian 'basic pay' that would otherwise have been payable to an employee for each pay period within a qualifying period if the employee's civilian employment had not been interrupted by military active duty."  OPM Policy Guidance at 6.  Exhibit C sets forth LTC Lee's projected civilian basic pay, by pay period, during his mobilization, computed in accordance with the OPM Policy Guidance.

49.     Next, the OPM Policy Guidance "requires determining the actual paid gross amount of military pay and allowances allocable to each pay period in a qualifying period."  OPM Policy Guidance at 9.  This is a multi-step process that includes (1) identifying the affected months; (2) determining the monthly amount of military pay and allowances; (3) computing the military daily rate of pay; and (4) allocating military pay and allowances to the civilian biweekly pay period.  *Id.* at 9-10.  Exhibit D sets forth LTC Lee's military daily rate of pay, computed in accordance with steps (1) through (3) of the OPM Policy Guidance.  Exhibit E allocates LTC Lee's military pay and allowances to the civilian biweekly pay period in accordance with the step (4) of the OPM Policy Guidance.

50.     Once the projected civilian basic pay is computed and military pay and allowances are allocated to the civilian biweekly pay periods, the OPM Policy Guidance directs a comparison between the two amounts "[f]or each civilian biweekly pay period[.]" OPM Policy Guidance at 10.  "If the allocated military pay and allowances are greater than or equal to the project civilian basic pay for any biweekly pay period, no reservist differential is payable for that pay period.  If the projected civilian basic pay is greater than the allocated military pay and

12

allowances for any biweekly pay period, the difference represents the *unadjusted* reservist differential." *Id.* (emphasis in original). Exhibit F sets forth LTC Lee's unadjusted reservist differential, by pay period, during his mobilization, computed in accordance with the OPM Policy Guidance.

51. Finally, the OPM Policy Guidance directs that the unadjusted reservist differential be adjusted for paid hours (*e.g.*, civilian paid work hours or paid time off, such as paid military leave). OPM Policy Guidance at 10-11. This is done by computing the percentage of total hours in the civilian biweekly pay period that were leave without pay (LWOP) and multiplying that percentage by the unadjusted reservist differential. The result is the amount of reservist differential owed for that civilian biweekly pay period. *Id.* at 11. Exhibit G sets forth LTC Lee's adjusted reservist differential, by pay period, during his mobilization, computed in accordance with the OPM Policy Guidance.

52. As shown in Exhibit G, over the course of his mobilization, the total differential between LTC Lee's military pay and his civilian pay, computed on a per-pay period basis in accordance with the OPM Policy Guidance, was approximately $22,871.97.

53. Therefore, LTC Lee has lost approximately $22,871.97, plus interest from the date each differential payment should have been made, as a result of Defendant's wrongful failure to pay him the differential pay to which he is entitled under 5 U.S.C. § 5538.

## **COUNT**

54. Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 53 of this Complaint.

55. Plaintiff was absent from his federal civilian employment with the DIA to perform active-duty military service under contingency operation for active duty operational support (CO-ADOS) mobilization orders issued pursuant to 10 U.S.C. § 12301(d) during a time

of national emergency declared by the President under Presidential Proclamation 7463. On their face, and in accordance with AR 135-200, LTC Lee's orders establish that he was ordered to active duty for a contingency operation and that his service was connected to a national emergency. Moreover, his specific duties and responsibilities while mobilized are connected to the same national emergency. LTC Lee's orders therefore fall within the scope of 5 U.S.C. § 5538(a).

56.     Throughout his entire mobilization, Plaintiff was entitled to re-employment rights with respect to his position within the DIA under chapter 43 of Title 38, United States Code.

57.     Plaintiff did not receive the civilian pay to which he was otherwise entitled by virtue of his employment within the DIA during his mobilization.

58.     Plaintiff was therefore entitled to differential pay under 5 U.S.C. § 5538 during his mobilization.

59.     Defendant has violated 5 U.S.C. § 5538 by failing to pay Plaintiff the differential pay to which he is entitled.

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands judgment as follows:

(a)     Payment of all wrongfully denied differential pay due to him under the law, totaling $22,871.97;

(b)     Interest on such wrongfully denied differential pay, accruing as of the dates on which such payments were to be made;

(c)     Award to Plaintiff of costs and attorneys' fees; and

(d)     The grant of such other relief as the Court deems just and proper.

Dated: November 20, 2023                    Respectfully submitted,

/s/ Scott A. Felder
Scott A. Felder
WILEY REIN LLP
2050 M Street NW
Washington, DC 20036
sfelder@wiley.law
Phone: (202) 719-7000
Facsimile: (202) 719-7049

*Counsel for Lieutenant Colonel Francis N. Lee*